1  RAYMOND H. AVER - State Bar No. 109577
   LAW OFFICES OF RAYMOND H. AVER
2  A Professional Corporation
   1950 Sawtelle Boulevard, Suite 120
3  Los Angeles, California  90025
   Telephone: (310) 571-3511
4  e-mail: ray@averlaw.com

5  Attorneys for Interested Party and Creditor
   DAVID R. SILBERSTEIN

6

7

8                  UNITED STATES BANKRUPTCY COURT

9        CENTRAL DISTRICT OF CALIFORNIA [SAN FERNANDO VALLEY DIVISION]

10

11 | In re:                        )    Case No. 1:09-bk-12032-MT
                                   )
12 | DOUBLE S DEVELOPMENT, LLC,    )    Chapter 7
                                   )
13 |                              )    OPPOSITION TO "MOTION TO APPROVE
                                   )    COMPROMISE OF CONTROVERSY
14 |          Debtor.             )    PURSUANT TO FEDERAL RULE OF
                                   )    BANKRUPTCY PROCEDURE 9019(a)";
15 |                              )    MEMORANDUM OF POINTS AND
                                   )    AUTHORITIES; DECLARATION(S) AND
16 |                              )    EXHIBIT(S) IN SUPPORT THEREOF
                                   )
17 |                              )
                                   )
18 |                              )
                                   )
19 |                              )    Date:    July 26, 2012
                                   )    Time:    1:00 p.m.
20 |                              )    Place:   Courtroom 302
                                   )             U.S. Bankruptcy Court
21 |                              )             21041 Burbank Boulevard
                                   )             Woodland Hills, California
22 |                              )
                                   )
23 | _____)

24

25

26

27

28

**TO THE HONORABLE MAUREEN A. TIGHE, UNITED STATES BANKRUPTCY JUDGE:**

David R. Silberstein ("Silberstein"), a party in interest in the above captioned case, submits the following "Opposition To 'Motion To Approve Compromise Of Controversy Pursuant To Federal Rule Of Bankruptcy Procedure 9019(a).'"

The "Motion To Approve Compromise Of Controversy Pursuant To Federal Rule Of Bankruptcy Procedure 9019(a)" ("Compromise Motion") should be denied for the following reasons:

1.    the Trustee is likely to be successful in the litigation against Conroe Investors, Ltd. ("Conroe Investors");

2.    there are no concerns regarding the collection of a judgment against Conroe Investors;

3.    the litigation against Conroe Investors is not particularly complex and will not cause significant expense, inconvenience, or delay;

4.    the proposed settlement agreement is not in the best interests of creditors;

5.    the settlement is not fair and equitable; and

6.    counsel for Conroe Investors have an actual conflict of interest in their simultaneous representation of Schreiber and Conroe Investors.


**WHEREFORE,** it is respectfully requested that the Court issue an order denying the Compromise Motion, and for such other and further

///

///

Law Offices of
Raymond H.
Aver, APC

1 | relief as is just and proper.

2

3 | Dated: July 20, 2012                    LAW OFFICES OF RAYMOND H. AVER
                                            A Professional Corporation
4

5

6 |                                          By: _____
                                                 RAYMOND H. AVER
7 |                                          Attorneys for
                                            DAVID R. SILBERSTEIN
8 |                                          Creditor and Interested Party

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

The "Motion To Approve Compromise Of Controversy Pursuant To Federal Rule Of Bankruptcy Procedure 9019(a)" ("Compromise Motion"), filed on behalf of David Seror, the Chapter 7 trustee for the Double S Development, LLC bankruptcy estate ("Trustee"), should be denied for the following reasons:

1.   the Trustee is likely to be successful in the litigation against Conroe Investors, Ltd. ("Conroe Investors");

2.   there are no concerns regarding the collection of a judgment against Conroe Investors;

3.   the litigation against Conroe Investors is not particularly complex and will not cause significant expense, inconvenience, or delay;

4.   the proposed settlement agreement is not in the best interests of creditors;

5.   the settlement is not fair and equitable; and

6.   counsel for Conroe Investors have an actual conflict of interest in their simultaneous representation of Schreiber and Conroe Investors.

Therefore, David Silberstein ("Silberstein"), a creditor and interested party, respectfully requests that the Court deny the Compromise Motion.

///

///

II.

STATEMENT OF FACTS

Silberstein And Segal

Silberstein and Richard J. Segal ("Segal") were business partners with various shared business interests.

Segal is and has been for all relevant times the president of LCV, Inc., the general partner of Conroe Investors, Ltd. ("Conroe Investors").

Double S Development, LLC ("Double S Development") was originally intended to be a joint Silberstein and Segal project.

The Conroe Village Property

In or about January 1999, Conroe Investors acquired property in Lake Conroe Village, consisting of residential lots ("Residential Lots") and commercial reserves ("Commercial Reserves")(jointly, the "Conroe Village Property"). At or around the same time, Conroe Investors received a loan from the International Bank of Commerce ("IBC"). This loan was memorialized by a promissory note in the principal amount of $2,500,000.00 ("IBC Note"), secured by a deed of trust against the Conroe Village Property ("IBC Trust Deed").

On or about September 5, 2002, Conroe Investors and IBC entered into a "Memorandum Of Renewal, Extension And/Or Modification" ("IBC Lien Extension") extending the maturity date of the IBC Note.

On or about December 1, 2002, Conroe Investors and Double S Development entered into a Real Estate Purchase Agreement whereby Double S Development purchased the Residential Lots by paying $75,000 and taking the property subject to $2,525,000.00, including the IBC

1  Note, in liabilities ("Double S Contract").

2      In or around fall of 2004, Segal suggested to Silberstein that
3  the junior liens against the Conroe Village Property could be removed
4  by having one of their entities purchase the IBC Note and IBC Trust
5  Deed and then foreclose on the IBC Trust Deed.

6      Pursuant to Segal's advice, on or about October 22, 2004,
7  Silberstein caused Syndicate Exchange Corporation ("Syndicate
8  Exchange") to purchase the IBC Note and IBC Trust Deed from IBC.

9      Soon thereafter, Syndicate Exchange began the process to
10 foreclose on the Conroe Village Property.  Silberstein and Segal
11 discussed the foreclosure, and Segal, on behalf of Conroe Investors,
12 signed a "Waiver Of Notice And Consent To Foreclosure Of Property
13 Owned By Conroe Investors, Ltd." ("Conroe Waiver"), waiving the 20 day
14 notice period for the foreclosure of the Commercial Reserves.

15     On or about December 7, 2004, Syndicate Exchange foreclosed on
16 the Commercial Reserves pursuant to the IBC Trust Deed.  Syndicate
17 Exchange was the successful purchaser of the Commercial Reserves at
18 the foreclosure auction.  At or around this time, Syndicate Exchange
19 also  foreclosed on the Residential Lots pursuant to the IBC Trust
20 Deed.

21

22 <u>The Current Value Of The Commercial Reserves</u>

23     The Commercial Reserves consist of approximately 7.8945 acres of
24 land worth approximately $5.50 to $6.25 per square foot for a total
25 estimated value of $1,891,364.31 to $2,149,277.63.

26

27 <u>The Schreiber Case</u>

28     On October 2, 2007, a "Complaint For: 1) Breach Of Contract; 2)

1    Common Count - Money Lent; 3) Common Count - Money Had And Received;

2    4) Fraud; 5) To Set Aside Fraudulent Conveyance; 6) Constructive

3    Trust," was filed on behalf of Bert Schreiber ("Schreiber") initiating

4    *Screiber v. Double S Development, et al.*, LASC Case No. LC079255

5    ("Schreiber State Court Case").

6       On or about May 7, 2009, the court in the Schreiber State Court

7    Case issued a "Final Decision" ("Schreiber Decision") finding in favor

8    of Schreiber.  Pursuant to the Schreiber Decision, the court in the

9    Schreiber State Court Case disregarded Silberstein's defense that

10   Segal was the mastermind behind the alleged fraud against Schreiber as

11   irrelevant as long as Silberstein participated in the fraudulent acts.

12      On or about June 15, 2009, the court in the Schreiber State Court

13   Case issued a "Judgment And Permanent Injunction" ("Schreiber

14   Judgment"), which set aside the foreclosure of the IBC Note and

15   appeared to cause the Commercial Reserves to revert back to Double S

16   Development.  This reversion of the Commercial Reserves makes sense as

17   it would increase the assets available for payment to Schreiber.

18   However, on or about May 23, 2011, the court in the Schreiber State

19   Court Action entered an "Corrected Judgment And Permanent Injunction"

20   ("Corrected Judgment") which clarified that the Schreiber Judgment

21   which declared that the effect of the Schreiber Judgment was to revert

22   the property which had been foreclosed under the IBC Note to its

23   previous title holder, which in the case of the Commercial Reserves

24   would be Conroe Investors.

25

26   <u>The Double S Development Bankruptcy</u>

27      On or about February 25, 2009, Double S Development caused to be

28   filed a voluntary petition for relief under chapter 7 of the

1  Bankruptcy Code.

2      David Seror ("Trustee") is the duly appointed and acting chapter

3  7 trustee of the Double S Development estate.

4

5  The Fraudulent Transfer Adversary Proceeding

6      On August 21, 2009, the Trustee filed a "Complaint For: (1)-(8)

7  Avoidance And Recovery Of Fraudulent Transfers; (9) Avoidance And

8  Recovery Of Preferences; (10)-(11) Avoidance Of Post-Petition

9  Transfers; (12) Turnover Of Property Of The Bankruptcy Estate; (13)

10 Declaratory Relief - Title To The Conroe Property; (14) Declaratory

11 Relief - Alter Ego; (15) Quiet Title; (16) Disallowance Of Claims;

12 (17) Breach Of Fiduciary Duty; (18) Conspiracy To Defraud; And (19)

13 Constructive Trust" ("Complaint").  This complaint seeks to avoid

14 certain transfers made by Double S Development and various other

15 entities and individuals, including Syndicate Exchange and Silberstein

16 (collectively, the "Fraudulent Transfer Defendants")

17     On or about September 17, 2010, the Trustee and the defendants

18 entered into a "Settlement And Release Agreement" ("Fraudulent

19 Transfer Settlement Agreement"), which the Court approved.  Pursuant

20 to the Fraudulent Transfer Settlement Agreement the Trustee received

21 all rights, title, and interest to the Conroe Village Property held by

22 the Fraudulent Transfer Defendants, including the IBC Note and IBC

23 Trust Deed.

24

25 The Conroe Adversary Proceeding

26     On September 12, 2011, the Trustee caused to be filed a

27 "Complaint For: (1) Judicial Foreclosure; (2) Recovery Under

28 Promissory Note; (3) Recovery Of Attorneys' Fee," initiating the

1  adversary proceeding *Seror v. Conroe Investors, Ltd., et al.*, USBC

2  Case No. 1:11-ap-01544-MT ("Conroe Adversary Proceeding").  The Conroe

3  Adversary Proceeding seeks the judicial foreclosure of the Commercial

4  Reserves pursuant to the IBC Note.

5      On November 4, 2011, Conroe Investors caused to be filed a

6  "Motion To Dismiss Pursuant To Rule 12(b)(6) By Defendant Conroe

7  Investors, Ltd." ("Motion To Dismiss"), arguing a statute of

8  limitations defense.

9      On November 16, 2011, the Trustee caused to be filed an

10 "Opposition Of David Seror, Chapter 7 Trustee To Defendant's Motion To

11 Dismiss Pursuant To Rule 12(B)(6)," arguing the statute of limitations

12 should be equitably tolled.

13     On December 22, 2011, the Court, after issuing a tentative

14 ruling, granted the Motion To Dismiss, with leave for the Trustee to

15 amend the complaint in order to add additional allegations regarding

16 equitable tolling.

17     In or about June 2012, the Trustee, Conroe Investors, Richard

18 Segal, and RJS Realty, Ltd. entered into a "Settlement And Release

19 Agreement" ("Settlement Agreement").  Pursuant to the Settlement

20 Agreement, the Conroe Investors will stipulate to the Trustee

21 foreclosing on the IBC Trust Deed, the Trustee will transfer the

22 Commercial Reserves to Conroe Reserves, LLC ("Conroe Reserves"), and

23 Conroe Reserves will receive a promissory note in the face amount of

24 $250,000.00, secured by the Commercial Reserves and personally

25 guaranteed by Segal.

26     On July 5, 2012, the Trustee caused to be filed a "First Amended

27 Complaint For Judicial Foreclosure" and the Compromise Motion.

28     On July 12, 2012, the Court issued an "Order On Ex Parte

*Law Offices of*
*Raymond H.*
*Aver, APC*

1  Application For An Order Continuing July 26, 2012 Hearing On Trustee's

2  Motion To Approve Compromise Of Controversy Due To Unavailability Of

3  Counsel To Review And Prepare Timely Opposition," which extended the

4  deadline to file oppositions to the Compromise Motion to July 20,

5  2012.

6

7                                    III.

8                             LEGAL ANALYSIS

9

10  A.    Legal Standard

11      In order for the bankruptcy court to affirm a compromise

12  agreement, it is clear that there must be more than a mere good faith

13  negotiation of a settlement by the trustee. [*Martin v. Kane (In re A &*

14  *C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986)].   The court must

15  also find that the compromise is fair and equitable. [*Id.*]

16      In determining the fairness, reasonableness and adequacy of a

17  proposed settlement agreement, the court must consider:

18      (a)  The probability of success in the litigation;

19      (b)  the difficulties, if any, to be encountered in the matter of

20           collection;

21      (c)  the complexity of the litigation involved, and the expense,

22           inconvenience and delay necessarily attending it; and

23      (d)  the paramount interest of the creditors and a proper

24           deference to their reasonable views. [*Id.*]

25      The trustee, as the party proposing the compromise, has the

26  burden of persuading the bankruptcy court that the compromise is fair

27  and equitable and should be approved. [*Id.*] Further, Creditors'

28  objections to a compromise must be afforded deference. [*Id.* at 1383]

B.    The Court Should Not Approve The Settlement Agreement

The Court should not approve the Settlement Agreement because it is it is not in the best interests of the estate and all parties in interest, it is not fair and equitable, and it does not satisfy the factors set forth in the *A & C Properties* case.

1.    Probability Of Success On The Merits

The Trustee argues there exists uncertainty regarding the probability of success on the merits in the Conroe Adversary Proceeding.  More specifically, the Trustee raises the issue that the Trustee may be unsuccessful in defeating the statute of limitations defense raised by Conroe Investors.

While the outcome of litigation is always uncertain, the Trustee appears to have a strong case for the equitable tolling of the statute of limitations to foreclose on the Commercial Reserves Pursuant to the IBC Trust Deed.

a.    The Memorandum Of Renewal, Extension And/Or
Modification Extended The Limitations Period For The
Enforcement Of The IBC Trust Deed

Pursuant to Texas *Civil Practice & Remedies Code* §16.036, the party liable for a debt can suspend the running of the four year statute of limitations for liens by signing and recording an extension of the lien.    On or about September 5, 2002, Conroe Investors and IBC entered into and caused to be recorded the IBC Lien Extension.    Thus, it is clear that the statute of limitations on enforcement of the IBC Trust Deed was extended to at least September 5, 2002.

Further, Segal, the president of the general partner of Conroe Investors, represented to the Court in the "Opposition Of Motion For Order Authorizing Employment Of Kane Russell Coleman & Logan PC As

1  Special Counsel To The Estate Effective May 1, 2011" ("Opposition To

2  Texas Counsel") that IBC accelerated the IBC Note on September 24,

3  2004, meaning that the maturity date of the IBC Note and the IBC Trust

4  Deed had been extended to at least that date. [Opposition To Texas

5  Counsel p.3, lines 12-15, Docket #139]

6      Therefore, the statute of limitations for the IBC Note and IBC

7  Trust Deed started to run on September 24, 2004.

8          b.    The Statute Of Limitations Should Be Equitably Tolled

9      In order to establish that a statute of limitations should be

10  equitably tolled a plaintiff need only establish: (1) that he has been

11  pursuing his rights diligently; and (2) that some extraordinary

12  circumstance stood in is way. [*Pace v. DiGuglielmo*, 544 U.S. 408, 418

13  (2005)]

14      Texas courts have cited to the federal case law regarding

15  equitable tolling and have used an alternative test which allows

16  equitable tolling "in situations where the claimant has actively

17  pursued his judicial remedies by filing a defective pleading during

18  the statutory period, or where the complainant has been induced or

19  tricked by his adversary's misconduct into allowing the filing

20  deadlines to pass."

21      In the case at hand, both tests have been met.

22          i.    Syndicate Exchange Diligently Pursued Its Rights

23                By Foreclosing On The IBC Trust Deed And Was Not

24                Able To Attempt A Second Foreclosure Until The

25                Issuance Of The Corrected Judgment

26      First, Syndicate Exchange accelerated the IBC Note on September

27  24, 2004.  Syndicate Exchange foreclosed on the Commercial Reserves

28  pursuant to the IBC Trust Deed on December 7, 2004.

Second, Syndicate Exchange and/or the Trustee could not have foreclosed upon the Commercial Reserves pursuant to the IBC Trust Deed a second time during the original statute of limitations because this would have been procedurally impossible.  It was not until the Corrected Judgment was issued by the court in the Schreiber State Court Action that it was possible to foreclose a second time on the IBC Trust Deed.

While it could be argued that the it would be inequitable to toll the statute of limitations because the original foreclosure of the Conroe Village Property pursuant to the IBC Trust Deed was determined to be a sham, this argument is unpersuasive.

First, the Court in the Schreiber State Court Action was concerned only with the how the foreclosure of the Conroe Village Property was fraudulent as to Schreiber, and did not focus on its effect on Conroe Investors.  Presumably, the Court vacated the effects of the foreclosure in order to benefit Schreiber.  As Schreiber held a judgment against Silberstein, and Silberstein owned stock in Syndicate Exchange, it would be more beneficial to Schreiber if Syndicate Exchange retained the ability to foreclose on the Commercial Reserves, because Schreiber could then levy on Silberstein's stock in Syndicate Exchange.  If the effect of the Corrected Judgment was to effectively extinguish the IBC Trust Deed, then the only entity that would benefit would be Conroe Investors, who was not a party to the Schreiber State Court Action.

Second, Segal, the president of the general partner of Conroe Investors was involved in the original foreclosure of the IBC Trust Deed.  Conroe Investors should not be allowed to benefit from its own fraudulent acts.

1   Thus, Syndicate Exchange diligently pursued its rights and could

2   not foreclose on the IBC Trust Deed until the court in the Schreiber

3   State Court Action issued the Corrected Judgment and the court should

4   allow the statute of limitations to foreclose on the IBC Trust Deed to

5   be equitably tolled.

6                ii.   Syndicate Exchange Was Induced Or Tricked By

7                      Conroe Investors Into Foreclosing On The IBC Trust

8                      Deed

9   Segal, the president of the general partner of Conroe Investors,

10  induced Syndicate Exchange to purchase and foreclose on the IBC Trust

11  Deed.   If the foreclosure was fraudulent, Conroe Investors was an

12  active participant in the fraud, not a victim of it.   Allowing Conroe

13  Investors to induce Syndicate Exchange to foreclose on the Commercial

14  Reserves and then finding the foreclosure to effectively extinguish

15  Syndicate Exchange's rights under the IBC Trust Deed would be

16  inequitable and would result in damage to creditors of Double S

17  Development and an undeserved windfall for Conroe Investors.

18        2.   There Will Be No Difficulty Of Collection If The Trustee Is

19             Successful In The Conroe Adversary Proceeding Because It

20             Seeks Judicial Foreclosure

21  The Trustee argues this factor weighs in favor of the Court

22  approving the Settlement Agreement because the Settlement Agreement is

23  structured as a transfer of property rights rather than a payment of

24  cash.   Thus, the Trustee is focusing on whether there are potential

25  problems with collecting on the Settlement Agreement.   However, this

26  factor is not concerned with whether the Settlement Agreement is

27  collectible, but rather whether there are concerns regarding the

28  collection of a judgment in the Conroe Adversary Proceeding.

1   If the Trustee were to prevail in the Conroe Adversary

2   Proceeding, there are no concerns with collection of a judgment,

3   because the Conroe Adversary Proceeding seeks the judicial foreclosure

4   of the Commercial Reserves.  Thus, success in the adversary would lead

5   directly to the estate either acquiring the Commercial Reserves or

6   receiving a substantial payment at the foreclosure sale.

7       Therefore, there is are no concerns regarding collection of a

8   judgment in the Conroe Adversary Proceeding and this factor weighs

9   against Court approval of the Settlement Agreement.

10      3.    The Complexity Of The Litigation And The Expense,

11            Inconvenience, And Delay Cause By The Complexity

12      The Trustee admits that the underlying claim for judicial

13  foreclosure in this case is not inherently complex, but argues the

14  that the prosecuting Conroe Adversary Proceeding will be complex

15  because it requires the adjudication of complex issues of law,

16  including equitable tolling of the statute of limitations to foreclose

17  on the IBC Note.  The Trustee argues this adjudication would require

18  extensive discovery, including expert witnesses and a prolonged trial.

19  Further, the Trustee argues that the matter would probably involve

20  numerous unrelated matters related to the business interests of Segal

21  and Silberstein.

22      Actually, the litigation of the Conroe Adversary Proceeding

23  should be relatively simple.  The Trustee has already investigated

24  many of the related issues while prosecuting the Fraudulent Transfer

25  Adversary Proceeding and the motion to approve the Fraudulent Transfer

26  Settlement Agreement.  Further investigation, while perhaps necessary,

27  should not be extensive as virtually all of the facts after Syndicate

28  Exchange's foreclosure of the IBC Trust Deed are undisputed.  Thus,

1   any further investigation would likely be centered around the time of

2   the foreclosure by of the IBC Trust Deed by Syndicate Exchange.  It is

3   unclear why the Trustee believes expert witnesses would need to be

4   retained or why a lengthy trial would be necessary.

5       The core issue in the case is whether or not some sort of

6   equitable tolling of the statute of limitations to foreclose on the

7   IBC Trust Deed applies.  This is inherently a legal issue, and, as the

8   factual issues are virtually undisputed, should be amenable to summary

9   judgment or a short trial to determine the disputed issues of fact.

10  Thus, the Conroe Adversary Proceeding is not particularly complex and

11  could be resolved with relatively little expense, inconvenience, or

12  delay.   Thus, this factor weighs against court approval of the

13  Settlement Agreement.

14      4.   The Settlement Agreement Is Not In The Best Interests Of

15           Creditors

16      The Trustee argues the Settlement Agreement is in the best

17  interests of creditors because it resolves a major dispute with Conroe

18  Investors, affords a measure of finality to the estate, and will

19  permit a larger distribution to creditors.

20      However, the Commercial Reserves are worth close to

21  $2,000,000.00, while the Settlement Agreement will only net the estate

22  approximately $250,000.00.  Thus, the Settlement Agreement results in

23  a return of less than 15% of the value of the Commercial Reserves,

24  which the Conroe Adversary Proceeding seeks to foreclose upon.  Thus,

25  unless the chance of winning the Conroe Adversary Proceeding is very

26  low, creditors are more likely to receive a substantially higher

27  distribution if the Settlement Agreement is not approved.

28      Thus, the Settlement Agreement is not in the best interests of

1 creditors, and thus, this factor weighs against court approval of the

2 Settlement Agreement.

3      5.   The Settlement Agreement Is Not Fair And Equitable

4     The Settlement Agreement is not fair and equitable because it

5 allows Conroe Investors to receive a massive windfall at the expense

6 of Double S Development's creditors.  While the original foreclosure

7 of the IBC Trust Deed may have been found to be fraudulent as to

8 Schreiber, it was not fraudulent as to Conroe Investors.  Segal, the

9 president of the general partner of Conroe Investors, suggested and

10 actively participated in the purchase and foreclosure of the IBC Trust

11 Deed.  Thus, the foreclosure of the Commercial Reserves was not

12 fraudulent toward Conroe Investors and Conroe Investors should not be

13 able to benefit because its agent convinced Syndicate Exchange to

14 purchase and foreclose upon the IBC Trust Deed.  Therefore, the

15 Settlement Agreement is not fair and equitable and should not be

16 approved.

17      6.   Segal And Craig Smith Have Actual Conflicts Of Interest

18              Because Conroe Investors' Interests Directly Conflict With

19              Schreiber's Interests

20     Segal and Craig Smith represent Conroe Investors with regard to

21 the Conroe Adversary Proceeding and represent Schreiber as a creditor

22 in the Double S Development bankruptcy case.  Conroe Investors will

23 benefit if the Trustee loses the Conroe Adversary proceeding, because

24 it will retain the Commercial Reserves.  As a creditor of the Double S

25 Development bankruptcy estate, Schreiber will benefit by receiving a

26 larger distribution if the Trustee is successful in foreclosing on the

27 Commercial Reserves.  Thus, Schreiber's interests and Conroe

28 Investors' interests are in direct conflict and there is an actual

Law Offices of
Raymond H.
Aver, APC

1  conflict of interest regarding their representation by Segal and

2  Smith.

3

4                                 IV.

5                             CONCLUSION

6      Based on the facts and circumstances underlying the Compromise

7  Motion and in light of the authorities set forth above, Silberstein

8  respectfully requests that the Court issue an order denying the

9  Compromise Motion.

10

11  Dated: July 20, 2012            LAW OFFICES OF RAYMOND H. AVER
                                    A Professional Corporation
12

13

14                                 By:_____

15                                    RAYMOND H. AVER
                                    Attorneys for
16                                 DAVID R. SILBERSTEIN
                                    Creditor and Interested Party

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## DECLARATION OF DAVID R. SILBERSTEIN

3      I, DAVID R. SILBERSTEIN, declare:

4      1.    I am and have been a manager of Double S Development, LLC

5  ("Double S Development"), the debtor in the above-captioned case,

6  since its formation.  I am and have been the president of Syndicate

7  Exchange Corporation since 1985.  I am also a creditor of Double S

8  Development.

9

10 Silberstein And Segal

11     2.    Richard J. Segal ("Segal") and I were business partners with

12 various shared business interests.

13     3.    I am informed and believe that Segal is and has been for all

14 relevant times the president of LCV, Inc., the general partner of

15 Conroe Investors, Ltd. ("Conroe Investors").

16     4.    Double S Development, LLC ("Double S Development") was

17 originally intended to be a joint project between Segal and me.

18

19 The Conroe Village Property

20     5.    I am informed and believe that in or about January 1999,

21 Conroe Investors acquired property in Lake Conroe Village, consisting

22 of residential lots ("Residential Lots") and commercial reserves

23 ("Commercial Reserves")(jointly, the "Conroe Village Property").  At

24 or around the same time, Conroe Investors received a loan from the

25 International Bank of Commerce ("IBC").  This loan was memorialized by

26 a promissory note in the principal amount of $2,500,000.00 ("IBC

27 Note"), secured by a deed of trust against the Conroe Village Property

28 ("IBC Trust Deed").

Law Offices of
Raymond H.
Aver, APC

*OPPOSITION TO COMPROMISE MOTION*

6.    I am informed ane believe that on or about September 5, 2002, Conroe Investors and IBC entered into a "Memorandum Of Renewal, Extension And/Or Modification," extending the maturity date of the IBC Note.

7.    On or about December 1, 2002, Conroe Investors and Double S Development entered into a Real Estate Purchase Agreement whereby Double S Development purchased the Residential Lots by paying $75,000 and taking the property subject to $2,525,000.00, including the IBC Note, in liabilities ("Double S Contract").

8.    In or around fall of 2004, Segal suggested to me that the junior liens against the Conroe Village Property could be removed by having one of our entities purchase the IBC Note and IBC Trust Deed and then foreclose on the IBC Trust Deed.

9.    Pursuant to Segal's advice, on or about October 22, 2004, I caused Syndicate Exchange Corporation ("Syndicate Exchange") to purchase the IBC Note and IBC Trust Deed from IBC.

10.   Soon thereafter, Syndicate Exchange began the process to foreclose on the Conroe Village Property.  Segal and I discussed the foreclosure, and Segal, on behalf of Conroe Investors, signed a "Waiver Of Notice And Consent To Foreclosure Of Property Owned By Conroe Investors, Ltd." ("Conroe Waiver"), waiving the 20 day notice period for the foreclosure of the Commercial Reserves.  A true and correct copy of the Conroe Waiver is attached hereto as **Exhibit A**.

11.   On or about December 7, 2004, Syndicate Exchange foreclosed on the Commercial Reserves pursuant to the IBC Trust Deed.  Syndicate Exchange was the successful purchaser of the Commercial Reserves at the foreclosure auction.  At or around this time, Syndicate Exchange also  foreclosed on the Residential Lots pursuant to the IBC Trust

1 | Deed.

2

3 | The Current Value Of The Commercial Reserves

4 | 12. I am very familiar with the Commercial Reserves and have

5 | contacted brokers at various points in time for their opinions of the

6 | value of the Commercial Reserves. Based on a survey by Thomas Land

7 | Survey conducted in or about April 2004, the Commercial Reserves

8 | consist of approximately 7.8945 acres of land ("Thomas Survey"). On

9 | July 20, 2012 I received a "Broker Opinion of Value" from Lee Jones of

10 | Betz Commercial Brokerage, Inc. ("Jones Value Opinion") stating that

11 | the Commercial Reserves are worth approximately $5.50 to $6.25 per

12 | square foot. Thus, the total estimated value of the Commercial

13 | Reserves is $1,891,364.31 to $2,149,277.63. True and correct copies

14 | of the Thomas Survey and the Jones Value Opinion are attached hereto

15 | as **Exhibits B** and **C**, respectively.

16 | 13. The value of the Conroe Village Property had increased

17 | substantially in the last 18 months. The City of Conroe has annexed

18 | the Conroe Village Property, so now utility costs will drop

19 | dramatically because public utilities will now be provided by the City

20 | of Conroe. Similarly through the annexation, the street will now be

21 | maintained by City of Conroe.

22

23 | The Schreiber Case

24 | 14. On October 2, 2007, a "Complaint For: 1) Breach Of Contract;

25 | 2) Common Count - Money Lent; 3) Common Count - Money Had And

26 | Received; 4) Fraud; 5) To Set Aside Fraudulent Conveyance; 6)

27 | Constructive Trust," was filed on behalf of Bert Schreiber

28 | ("Schreiber") initiating *Screiber v. Double S Development, et al.,*

*Law Offices of*
*Raymond H.*
*Aver, APC*

1  LASC Case No. LC079255 ("Schreiber State Court Case").

2      15.   On or about May 7, 2009, the court in the Schreiber State
3  Court Case issued a "Final Decision" ("Schreiber Decision") finding in
4  favor of Schreiber.   Pursuant to the Schreiber Decision, the court in
5  the Schreiber State Court Case disregarded my defense that Segal was
6  the mastermind behind the alleged fraud against Schreiber as
7  irrelevant as long as I participated in the fraudulent acts.

8      16.   On or about June 15, 2009, the court in the Schreiber State
9  Court Case issued a "Judgment And Permanent Injunction" ("Schreiber
10  Judgment"), which set aside the foreclosure of the IBC Note and
11  appeared to cause the Commercial Reserves to revert back to Double S
12  Development.   This reversion of the Commercial Reserves makes sense as
13  it would increase the assets available for payment to Schreiber.
14  However, on or about May 23, 2011, the court in the Schreiber State
15  Court Action entered an "Corrected Judgment And Permanent Injunction"
16  ("Corrected Judgment") which clarified that the Schreiber Judgment
17  which declared that the effect of the Schreiber Judgment was to revert
18  the property which had been foreclosed under the IBC Note to its
19  previous title holder, which in the case of the Commercial Reserves
20  would be Conroe Investors.

21

22  The Double S Development Bankruptcy

23      17.   On or about February 25, 2009, Double S Development caused
24  to be filed a voluntary petition for relief under chapter 7 of the
25  Bankruptcy Code.

26      18.   David Seror ("Trustee") is the duly appointed and acting
27  chapter 7 trustee of the Double S Development estate.

28

*Law Offices of
Raymond H.
Aver, APC*

## The Fraudulent Transfer Adversary Proceeding

19.   On August 21, 2009, the Trustee filed a "Complaint For: (1)-(8) Avoidance And Recovery Of Fraudulent Transfers; (9) Avoidance And Recovery Of Preferences; (10)-(11) Avoidance Of Post-Petition Transfers; (12) Turnover Of Property Of The Bankruptcy Estate; (13) Declaratory Relief - Title To The Conroe Property; (14) Declaratory Relief - Alter Ego; (15) Quiet Title; (16) Disallowance Of Claims; (17) Breach Of Fiduciary Duty; (18) Conspiracy To Defraud; And (19) Constructive Trust" ("Complaint").  This complaint seeks to avoid certain transfers made by Double S Development and various other entities and individuals, including Syndicate Exchange and me (collectively, the "Fraudulent Transfer Defendants").

20.   On or about September 17, 2012, the Trustee and the Fraudulent Transfer Defendants entered into a "Settlement And Release Agreement" ("Fraudulent Transfer Settlement Agreement"), which the Court approved.  Pursuant to the Fraudulent Transfer Settlement Agreement the Trustee received all rights, title, and interest to the Conroe Village Property held by the Fraudulent Transfer Defendants, including the IBC Note and IBC Trust Deed.

## The Conroe Adversary Proceeding

21.   On September 12, 2011, the Trustee caused to be filed a "Complaint For: (1) Judicial Foreclosure; (2) Recovery Under Promissory Note; (3) Recovery Of Attorneys' Fee," initiating the adversary proceeding *Seror v. Conroe Investors, Ltd., et al.*, USBC Case No. 1:11-ap-01544-MT ("Conroe Adversary Proceeding").  The Conroe Adversary Proceeding seeks the judicial foreclosure of the Commercial Reserves pursuant to the IBC Note.

22.   On November 4, 2011, Conroe Investors caused to be filed a "Motion To Dismiss Pursuant To Rule 12(b)(6) By Defendant Conroe Investors, Ltd." ("Motion To Dismiss"), arguing a statute of limitations defense.

23.   On November 16, 2011, the Trustee caused to be filed an "Opposition Of David Seror, Chapter 7 Trustee To Defendant's Motion To Dismiss Pursuant To Rule 12(B)(6)," arguing the statute of limitations should be equitably tolled.

24.   On December 22, 2011, the Court, after issuing a tentative ruling, granted the Motion To Dismiss, with leave for the Trustee to amend the complaint in order to add additional allegations regarding equitable tolling.

25.   In or about June 2012, the Trustee, Conroe Investors, Segal, and RJS Realty, Ltd. entered into a "Settlement And Release Agreement" ("Settlement Agreement").   Pursuant to the Settlement Agreement, Conroe Investors will stipulate to the Trustee foreclosing on the IBC Trust Deed, the Trustee will transfer the Commercial Reserves to Conroe Reserves, LLC ("Conroe Reserves"), and Conroe Reserves will receive a promissory note in the face amount of $250,000.00, secured by the Commercial Reserves and personally guaranteed by Segal.

26.   On July 5, 2012, the Trustee caused to be filed a "First Amended Complaint For Judicial Foreclosure" and the Compromise Motion.

27.   On July 12, 2012, the Court issued an "Order On Ex Parte Application For An Order Continuing July 26, 2012 Hearing On Trustee's Motion To Approve Compromise Of Controversy Due To Unavailability Of Counsel To Review And Prepare Timely Opposition," which extended the deadline to file oppositions to the Compromise Motion to July 20, 2012.

1     28.   I have personal knowledge of the statements set forth in

2  this declaration, except where stated on information and belief, and

3  where so stated, I am informed and believe that such facts are true

4  and correct.   If called and sworn as a witness, I could and would

5  competently testify to the above.

6

7     Executed this 20th day of July, 2012, at Los Angeles, California.

8  I declare under penalty of perjury under the laws of the

9  United States of America that the foregoing is true and correct.

11     _____

           DAVID R. SILBERSTEIN

Law Offices of
Raymond H.
Aver, APC

Exhibit A

Sent By: RJS REALTY;                    3105890927;         Nov-1-04  4:17PM;         Page
To: DAVESILB          At: 18189957480

# WAIVER OF NOTICE AND CONSENT

## TO FORECLOSURE

## OF PROPERTY OWNED BY

## CONROE INVESTORS, LTD.

The undersigned President of LCV, Inc., General Partner of CONROE
INVESTORS, LTD., a Texas Limited Partnership does hereby waive the
twenty (20) day notice, relating to the Notice of Default received on
October 23, 2004 for the property referred to in that Real Estate Lien Note
in the original amount of $2,500,000, secured by a Deed of Trust,
recorded as Clerk's File No. 9906821 of the Deed of Trust Records of
Montgomery County, Texas on January 29, 1999

Dated: 10/23/04

Richard J. Segal, President of LCV, Inc.
General Partner of CONROE INVESTORS,
LTD. a Texas Limited Partnership

Exhibit B

Below is the acreage of the commercial property owned on Highway 105 W.

Westside of Lake Conroe Village Blvd.

Reserve A 2.2554 Acres

Reserve B 1.7149 Acres
(Residue of Commercial Reserve "B")

Total Westside 3.9703 Acres


Eastside of Lake Conroe Village Blvd.

Reserve C 2.2582 Acres

Reserve D (backside of Reserve C) ...........................0.677 acre

Reserve E (backside of Reserve D)........................ ...... 0.989 acre

Total Eastside 3.9242 acres

Total acreage 7.8945 Acres


Additional property owned - The road (450' x 60')

# Thomas Land Surveying, Inc.

Surveying · Planning · Project Management

April 22, 2004

Fieldnotes for 6.2285 acres of land being out of and a part of Commercial Reserves "A", "B", and "C" of Lake Conroe Village, a subdivision out of the William Atkins Survey, Abstract No. 3, in Montgomery County, Texas according to the map or plat thereof recorded in Cabinet F, Sheet 6-B of the Map Records of Montgomery County, said 6.2285 acres of land being more particularly described in three tracts by metes and bounds as follows:

### Tract One
### 2.2554 Acres
### (Residue of Commercial Reserve "A")

BEGINNING at a 5/8 inch steel rod with cap found in the Southerly line of State Highway No. 105 (right-of-way varies at this point), marking the Northwest corner of the herein described tract, said point being in the Westerly line of said Commercial Reserve "A" and the common Easterly line of that certain 28.583 acre tract of land conveyed to Stephen J. Shaper and wife, Sue Zigenbein Shaper as described in deed recorded under County Clerk's File No. 8539655 of the Real Property Records of Montgomery County, said point also being the Southeast corner of that certain 2.125 acre tract of land conveyed to the State of Texas as described in deed recorded under County Clerk's File No. 9232731 of the said Real Property Records, and being the common Southwest corner of that certain 4.892 acre tract of land conveyed to the State of Texas as described in instrument recorded under County Clerk's File No. 9307450 of the said Real Property Records;

Thence, South 64°10'51" East (called South 67°10'18" East in 4.892 acre instrument), 35.62 feet with the Southerly line of said State Highway No. 105 and the said 4.892 acre tract to a 5/8 inch steel rod set for an angle point of the herein described tract;

Thence, continuing with the Southerly line of said State Highway No. 105 and the said 4.892 acre tract, South 61°26'45" East (called South 64°24'23" East in 4.892 acre instrument), 604.97 feet to a 3 inch brass disk in concrete (stamped "TX. DOT") found at a second angle point of the herein described tract;

Thence, continuing with the Southerly line of said State Highway No. 105 and the said 4.892 acre tract, South 77°05'40" East (called South 80°05'26" East in 4.892 acre instrument), 169.10 feet to a 5/8 inch steel rod with cap found in the Easterly line of said Commercial Reserve "A" marking the Northeast corner of the herein described tract, said point being in the common Westerly line of said Commercial Reserve "B";

Thence, South 22°46'57" West, 136.43 feet with the Easterly line of said Commercial Reserve "A" and the common Westerly line of said Commercial Reserve "B" to a 5/8 inch steel rod set for the Southeast corner of said Commercial Reserve ' A" and the herein described tract, said point being the common Southwest corner of said Commercial Reserve "B", said point also being in the Northerly line of Block 7 of said Lake Conroe Village, and from which point a found 1/2 inch steel rod bears South 54°15' East, 0.48 feet;

Thence, North 67°13'03" West, 674.09 feet with the Southerly line of said Commercial Reserve "A" and the common Northerly line of said Block 7 to a 5/8 inch steel rod set in the Easterly line of the said 28.583 acre tract and marking the Southwest corner of said Commercial Reserve "A" and the herein described tract, said point also being the Northwest corner of said Block 7, and from which point a found 1 inch steel rod bears North 84°55' East, 0.64 feet;

Thence, North 14°35'33" West (called North 14°30'00" West in Cabinet F, Sheet 6-B and North 17°29'52" West in 2.125 acre deed and 4.892 acre instrument), 214.11 feet to the PLACE OF BEGINNING and containing 2.2554 acres or 98,244 square feet of land, more or less.

14340 Torrey Chase · Suite 270 · Houston, Texas 77014
(281) 440-7730 · Fax (281) 440-7737
www.thomaslandsurveying.com



Tract Two
1.7149 Acres
(Residue of Commercial Reserve "B")

BEGINNING at a 1/2 steel rod found in the Westerly line of Lake Conroe Village Boulevard, based on a 100.00 foot right-of-way, for the Southeast corner of said Commercial Reserve "B" and the herein described tract, said point being the common Northeast corner of Block 7 of said Lake Conroe Village and being in a non-tangent curve to the left having a radius of 250.00 feet;

Thence, North 67°13'03" West, 494.58 feet with the Southerly line of said Commercial Reserve "B" and the common Northerly line of said Block 7 to a 5/8 inch steel rod set for the Southwest corner of said Commercial Reserve "B" and the herein described tract, said point being the common Southeast corner of said Commercial Reserve "A", and from which point a found 1/2 inch steel rod bears South 54°15' East, 0.48 feet;

Thence, North 22°46'57" East, 136.43 feet with the Westerly line of said Commercial Reserve "B" and the common Easterly line of said Commercial Reserve "A" to a 5/8 inch steel rod with cap found marking the Northwest corner of the herein described tract, said point being in the South line of said State Highway No. 105 and the said 4.892 acre tract;

Thence, South 77°05'40" East (called South 80°05'26 East in 4.892 acre instrument), 138.71 feet with the South line of said State Highway No. 105 and the said 4.892 acre tract to a 3 inch brass disk in concrete (stamped "TX. DOT") found at an angle point of the herein described tract;

Thence, continuing with the Southerly line of said State Highway No. 105 and the said 4.892 acre tract, South 63°35'20" East (called South 66°37'28" East in 4.892 acre instrument), 201.24 feet to a 3 inch brass disk in concrete (stamped "TX. DOT") found at a second angle point of the herein described tract;

Thence, continuing with the Southerly line of said State Highway No. 105 and the said 4.892 acre tract South 67°33'56" East (called South 70°34'05" East in 4.892 acre instrument), 159.16 feet to a 5/8 inch steel rod set in the Easterly line of said Commercial Reserve "B" for the Northeast corner of the herein described tract, said point also being in the Westerly line of said Lake Conroe Village Boulevard;

Thence, South 22°46'57" West, 116.46 feet with the Easterly line of said Commercial Reserve "B" and the common Westerly line of said Lake Conroe Village Boulevard to a 5/8 inch steel rod set at a point of curve to the right, having a radius of 250.00 feet and a central angle of 07°21'15";

Thence, in a Southerly direction, with Easterly line of said Commercial Reserve "B" and the common Westerly line of said Lake Conroe Village Boulevard, and with the said curve to the right having a radius of 250.00 feet (chord bearing South 26°27'35" West, 32.07 feet), an arc distance of 32.09 feet to the PLACE OF BEGINNING and containing 1.7149 acres or 74,699 square feet of land, more or less.

Tract Three
2.2582 Acres
(Residue of Commercial Reserve "C")

BEGINNING at a 1/2 inch steel rod found in the Easterly line of Lake Conroe Village Boulevard, based on
a 100.00 foot right-of-way, for the Southwest corner of said Commercial Reserve "C" and the
herein described tract, said point being the common Northwest corner of Unrestricted Reserve "D"
of said Lake Conroe Village, said point also being in the arc of a non-tangent curve to the left
having a radius of 350.00 feet and a central angle of 05°14'45";

Thence, in a Northerly direction with the Easterly line of said Lake Conroe Village Boulevard and the
common Westerly line of said Commercial Reserve "C", and with the said curve to the left having
a radius of 350.00 feet (chord bearing North 25°24'20" East, 32.03 feet), an arc distance of 32.05
feet to a 5/8 inch steel rod set at a point of tangency;

Thence, continuing with the Easterly line of said Lake Conroe Village Boulevard and the common
Westerly line of said Commercial Reserve "C", North 22°46'57" East, 117.06 feet to a 5/8 inch
steel rod set for the Northwest corner of the herein described tract, said point being in the South
line of said State Highway No. 105 and the said 4.892 acre tract;

Thence, South 67°33'56" East (called South 70°34'05" East in 4.892 acre instrument), 441.81 feet with the
South line of said State Highway No. 105 and the said 4.892 acre tract to a 5/8 inch steel rod set at
an angle point of the herein described tract;

Thence, South 66°24'35" East (called South 69°24'02" East in 4.892 acre instrument), 180.28 feet with the
South line of said State Highway No. 105 and the said 4.892 acre tract to a 5/8 inch steel rod
found in the Easterly line of said Commercial Reserve "C" marking the Northeast corner of the
herein described tract, said point being in the Westerly line of Saddle and Surrey Acres, according
to the map or plat thereof recorded in Cabinet A, Sheet 115-A of the said Map Records, said point
also being the Southeast corner of the said 4.892 acre tract and the common Southwest corner of
that certain 0.410 acre tract of land conveyed to the State of Texas as described in deed recorded
under County Clerk's File No. 9126444 of the said Real Property Records;

Thence, South 00°26'07" East (called South 00°13'00" East in Cabinet F, Sheet 6-B and South 00°13'54"
East in Cabinet A, Sheet 115-A), 162.35 feet with the Easterly line of said Commercial Reserve
"C" and the common Westerly line of said Saddle and Surrey Acres to a 1/2 inch steel rod found



Exhibit C



INVESTMENT REAL ESTATE · COMMERCIAL BROKERAGE · LEASING · ACQUISITION & DEVELOPMENT

COMMERCIAL REAL ESTATE SINCE 1976

July 20, 2012

    **RE:**    *Broker Opinion of Value*

Dear Mr. Silberstein:

Based upon the information you have provided us regarding the commercial tracts of raw land located on the northwest and southwest corners of Hwy. 105 at Lake Conroe Village Blvd. in Conroe, Texas we believe that the property should be listed with an asking price of approximately $6.25 per square foot with sales prices averaging approximately $5.50 per square foot, depending on the size and location of each sale.

Thank you for your consideration,

Lee Jones, Sr. Vice President
Betz Commercial Brokerage, Inc.
832-678-4021
LJones@BetzCompanies.com

10940 W Sam Houston Pkwy N Ste 300
Houston, TX 77064
Main: 281.873.4444
Fax: 281.873.8156
BetzCompanies.com

NOTE: When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 1950 Sawtelle Boulevard, Suite 120, Los Angeles, California 90025

The foregoing document described **OPPOSITION TO "MOTION TO APPROVE COMPROMISE OF CONTROVERSY PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019(a)"; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION(S) AND EXHIBIT(S) IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 20, 2012**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

 __X__    Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **July 20, 2012**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

 __X__    Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 20, 2012**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

 __X__    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| July 20, 2012 | Sarah Scheckel | |
| *Date* | *Type Name* | Signature |

1

## SERVICE LIST

2

3    Via NEF

4    Raymond H Aver      ray@averlaw.com
     Austin K Barron      abarron@buchalter.com, IFS_filing@buchalter.com;tcarson@buchalter.com
5    John P Dillman      houston_bankruptcy@publicans.com
     John W Kim      jkim@nossaman.com
6    Dennis E Mcgoldrick      dmcgoldricklaw@yahoo.com
     Benjamin Seigel      bseigel@buchalter.com, IFS_filing@buchalter.com
7    David Seror (TR)      kpscion@ebg-law.com, dseror@ecf.epiqsystems.com
     David R Silberstein      drs1@pacbell.net
8    Gerald N Silver      silverlawoffice@sbcglobal.net
     United States Trustee (SV)      ustpregion16.wh.ecf@usdoj.gov

9

10   Via Personal Service

11   Hon. Maureen A. Tighe
     Bin on 1st Floor near Intake window

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28